Kenneth ALLEN; Barbara Allen, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 89–70252.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1990.

Decided Feb. 6, 1991.

---

Avram Salkin, Hochman, Salkin & DeRoy, Beverly Hills, Cal., for petitioners-appellants.

William A. Whitledge, U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WALLACE, Chief Judge, POOLE, Circuit Judge, and BREWSTER,* District Judge.

WALLACE, Chief Judge:

In 1981, Allen contributed $22,500 of borrowed funds, together with $2,500 of his own money, to a charitable organization. He and his wife then claimed the entire $25,000 as a charitable contribution on their 1981 tax return pursuant to section 170(a) of the Internal Revenue Code (Code), 26 U.S.C. § 170(a). The Commissioner of Internal Revenue (Commissioner) issued a notice of deficiency, denying the Allens' entire $25,000 deduction and also imposing a negligence penalty under 26 U.S.C. § 6653. Although the tax court ruled that Allen was entitled to a deduction for the $2,500 contributed from his own funds, it sustained the Commissioner's disallowance of the borrowed portion and upheld the negligence penalty. The Allens now appeal that ruling. The tax court had jurisdiction pursuant to 26 U.S.C. §§ 6214 and 7442. We have jurisdiction over this timely appeal pursuant to 26 U.S.C. § 7482. We affirm.

I

The transaction we review involved three related organizations. International Business Network (IBN) is a nonprofit organization founded by Bizar, which provides both educational services and political lobbying in support of small business interests. IBN holds tax-exempt status under 26 U.S.C. § 501(c)(6), and as a result is not eligible to receive charitable contributions under section 170 of the Code. In order to solicit such contributions, Bizar used $160,-000 of IBN funds to form the National Institute for Business Achievement (Institute), a tax-exempt foundation under 26 U.S.C. § 501(c)(3). The Institute provides education and training in skills necessary for small business ownership.

Bizar devised a plan for eliciting contributions to the Institute from members of the general public. The plan involved a third organization, the National Diversified Funding Corporation (Funding Corporation), a for-profit corporation. Bizar owned 40 percent of this corporation, and IBN owned the remaining 60 percent. Upon application, the Funding Corporation would loan money to a borrower at a 3 percent interest rate, with no principal payment due for 20 years. On the same day the borrower received the proceeds, he would transfer the funds to the Institute, along with a small contribution from his own funds. The borrower would then claim a charitable contribution deduction for the entire amount on his tax return.

The Funding Corporation would loan up to 90 percent of one's contribution to the Institute, but "[t]he investor's contribution of the proceeds was a condition for obtaining the loan." *Allen v. Commissioner*, 92 T.C. 1, 5 (1989) (*Allen*). The note to the Funding Corporation was not secured, and no outside credit reporting agency was ever consulted before approval of a borrower's application.

This program was a success only on account of a cooperative arrangement among the Institute, IBN, and the Funding Corporation. Bizar, who was the sole signatory on the bank accounts of each of the three organizations, set up a circular flow of funds to accomplish his purposes. The funding behind the program originated with the Institute, which loaned money to IBN on a short-term basis at a rate of 2½ percent. IBN then lent the money to the Funding Corporation for a 20–year term, also at a 2½ percent interest rate. The Funding Corporation then lent these funds at a 3 percent rate to investors, and the investors' immediate contribution of these funds to the Institute would complete the circular flow.

As a result of this money circle scheme, both the organizations and the "contributors" improved themselves financially. With each transaction, the Funding Corporation received a promise of small interest

* Honorable Rudi M. Brewster, United States District Judge, Southern District of California, sitting by designation.

payments and a repayment of principal in 20 years. The Institute, of course, merely broke even on the funds "contributed" from the loans, because it was the original source of these funds. It did, however, receive a small contribution from an investor's personal funds with each transaction. Finally, each investor received a huge tax benefit from his charitable contribution deduction, a benefit which more than offset the present value of the interest and principal he agreed to pay to the Funding Corporation. The loser in the whole endeavor was the federal government, which in effect financed the gains received by the Bizar-related organizations and the private investors.

Allen, the owner of a small business, was one of many who participated as a "contributor" in this plan. On December 29, 1981, Allen borrowed $22,500 from the Funding Corporation at the 3 percent interest rate, with no principal due for 20 years. Within 20 minutes of receiving the $22,500, Allen remitted these funds to the Institute, along with a $2,500 contribution from his own funds. The Allens claimed a charitable contribution deduction of $25,000 on their 1981 joint income tax return, but upon audit the Commissioner disallowed any deduction for the payments to the Institute and asserted both a tax deficiency of $4,541 and a negligence penalty under 26 U.S.C. § 6653.

The Allens challenged the Commissioner's decision, and the tax court ruled that the $22,500 borrowed from the Funding Corporation could not be deducted as a charitable contribution to the Institute. The court found that "the three Bizar-related entities, [the Institute], IBN, and [the Funding Corporation], worked as a functionally integrated whole." *Allen*, 92 T.C. at 8. The court concluded that the alleged donations were sham transactions, and were not deductible because "except with respect to the cash portion of a contribution, the [Bizar] unit was not enriched by a donor's 'contribution.'" *Id.* at 9. In addition, the court upheld the imposition of the negligence penalty. *Id.* at 12.

## II

We deal first with the Allens' contentions that the tax court erred in determining that they were not entitled to deduct the $22,500 paid to the Institute from the loan proceeds. We review the tax court's finding that the alleged contribution lacked economic substance under the clearly erroneous standard. *Shirar v. Commissioner*, 916 F.2d 1414, 1417 (9th Cir.1990); *Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir.1980) ("[T]he Tax Court's determination whether a transaction is lacking in economic substance is essentially a factual determination."), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).

Section 170 of the Code allows a charitable contribution deduction for any "contribution or gift" to organizations that qualify for tax-exempt status under 26 U.S.C. § 501(c)(3). 26 U.S.C. § 170(c). The taxpayer bears the burden of proving entitlement to such a charitable deduction. *Smith v. Commissioner*, 800 F.2d 930, 933 (9th Cir.1986). In support of their appeal, the Allens first point to an October 21, 1980, letter from the Internal Revenue Service stating that the Institute was an exempt organization under section 501(c)(3) of the Code and therefore could receive tax-deductible contributions. The Allens contend that they were entitled to rely on this determination of eligibility, and that the letter should be a shield against any decision by the Commissioner that their payment is nondeductible. Such an exemption letter, however, merely assures us that the Institute was a qualified donee and not that every payment to the Institute qualifies as a contribution. The Allens must demonstrate that they actually made a "contribution" to the Institute, and the exemption letter is irrelevant in that regard. *See* 26 U.S.C. § 170(c).

The Allens argue that they did indeed make a "contribution" to the Institute when they unconditionally transferred $22,500 in the form of a cashier's check to the Institute in December 1981. Usually, a payment in cash will qualify as a "contribution" under section 170(c) of the Code, even

when made with borrowed funds. *See Granan v. Commissioner*, 55 T.C. 753, 755 (1971) ("[W]hen a deductible payment is made with borrowed money, the deduction is not postponed until the years in which the borrowed money is repaid."). It is well-settled, however, that the substance of a transaction, not the form in which it is cast, controls for tax purposes. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945) ("To permit the true nature of a transaction to be disguised by mere formalisms ... would severely impair the effective administration of the tax policies of Congress.").

Upon close examination of the transaction, we hold that the tax court did not clearly err in finding the Institute, IBN, and the Funding Corporation operated essentially as an integrated whole with respect to the loan program. When one views the Bizar-related organizations as a single unit, it becomes clear that this functional unit was not enriched by the $22,500 "contributed" to the Institute. The passage of $22,500 through the three organizations as a result of the money circle scheme left each of them in essentially the same position as if no "contribution" had been made. Aside from Allen's $2,500 personal contribution, the only real economic change at the close of the transaction was Allen's obligation to pay funds over the next 20 years to the Bizar-related unit, something no different than if Allen had signed a note to pay the Institute $22,500 over 20 years. Such a promise to make a contribution in the future does not qualify for a current charitable deduction. *Williams v. Commissioner*, 429 U.S. 569, 578–79, 97 S.Ct. 850, 856–57, 51 L.Ed.2d 48 (1977); *Pauley v. United States*, 459 F.2d 624, 626 (9th Cir.1972) (stating that section 170 makes clear "that a promise unaccompanied by payment could not give rise to a deduction").

The Allens contend that it is wrong to view the Institute, IBN, and the Funding Corporation as one functional unit because they are in fact distinct legal entities. The Allens stress that the organizations serve different purposes and receive their funding from differing sources. In addition, the Allens emphasize the diverse ownership structures of the three entities. For example, the Funding Corporation is the only entity owned by shareholders.

Despite these arguments, it was not clear error to find the three organizations "were not at arm's length for purposes of the transaction in question." *Allen*, 92 T.C. at 8–9. Each of the entities kept its money at the same bank, and Bizar was the sole signatory on the accounts of each. To support the profitable "loan program," money was transferred from one organization to another, with investors such as Allen serving as conduits to bring the money full circle. A most poignant example is the transfer of money that took place on December 29, 1981, the date Allen made his "contribution" to the Institute. On that date, the Funding Corporation had only $2,230 in its account when it opened for business, and hence, was unable at that time to make the loan to Allen. To facilitate the loan, the Institute transferred money to IBN, which in turn transferred money to the Funding Corporation. As described above, the Funding Corporation then loaned $22,500 to Allen, who immediately gave the proceeds back to the Institute. The $22,500 received by the Institute on December 29, 1981, therefore originated with the Institute that morning. Such a ruse should not qualify for tax deductible treatment. *Cf. Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613, 58 S.Ct. 393, 394–95, 82 L.Ed. 474 (1938) ("A given result at the end of a straight path is not made a different result because reached by following a devious path.").

Moreover, it is not clear to us that the organizations in fact existed to serve separate and distinct purposes. The tax court found that the Funding Corporation made no loans to individuals who were not Institute contributors. *Allen*, 92 T.C. at 6. The court observed that the loan offering materials themselves stated that "[i]t is the purpose of the lender to aid the [I]nstitute." *Id.* at 4. Never did an individual take a Funding Corporation loan and then decline to participate in the Institute contri-

bution program. In addition, no contributions were made to the Institute without the Funding Corporation being involved in the transaction. *Id.* at 6. The tax court did not err in finding that, at least with respect to the contribution programs, the organizations acted with a common focus.

When looked at in context, the purported contribution had no value and did not enrich the Institute. Based upon the supportable findings, the tax court did not err when it held that the $22,500 was not deductible. *See Skripak v. Commissioner,* 84 T.C. 285, 319–20 (1985) (stating that the policy behind the deduction allowance is to support charities and holding that the amount of the deduction depends upon the value of the contribution).

## III

Section 6653 of the Code imposes a penalty of 5 percent of the amount of tax underpayment if such underpayment is due to negligence or disregard of rules or regulations. 26 U.S.C. § 6653. Prior to 1988, section 6653 also imposed an additional penalty of 50 percent of the interest due on such underpayment. *Id.* (interest penalty deleted by amendment in 1988). The Commissioner assessed penalties of both types against the Allens, and the tax court upheld that determination.

■ Because the assessment of the penalty is presumptively correct, the Allens have the burden of proving that their underpayment was not the result of negligence or disregard, and that therefore they should not be subject to section 6653 assessments. *Hansen v. Commissioner,* 820 F.2d 1464, 1469 (9th Cir.1987) (*Hansen* ); *Hanson v. Commissioner,* 696 F.2d 1232, 1234 (9th Cir.1983) (*Hansen* ). The tax court found that the Allens did not establish due care. We review this finding, and the corresponding imposition of the penalty, under the clearly erroneous standard. *See Moss v. Commissioner,* 831 F.2d 833, 837 (9th Cir.1987) ("we review the tax court's findings of fact ... only for clear error").

■ Negligence under section 6653 is defined as the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances. *Hansen,* 820 F.2d at 1469; *Zmuda v. Commissioner,* 731 F.2d 1417, 1422 (9th Cir.1984) (*Zmuda* ). The Allens argue that they are unsophisticated in tax matters, that they were unaware of the financing arrangement among the three Bizar-related entities, and that the penalty is therefore inappropriate in this case. The Allens' sincere belief in the legality of their charitable deduction, however, does not mean that the tax court clearly erred when it found they were negligent. *See Hansen,* 820 F.2d at 1469. Indeed, the circumstances that surrounded the $22,500 contribution were highly suspicious. Although no outside credit agency was contacted, Allen received a loan at 3 percent at a time when the prime rate exceeded 15 percent. Moreover, no principal was due on the loan for 20 years. The money, however, was only available on the condition that Allen transfer it to the Institute. The tax court did not clearly err in finding that this "packaging" aspect should have put the Allens on notice that something was indeed strange. The Allens were told that they could deduct $25,000 on their tax return, 10 times the amount of their actual cash outlay. Their tax savings of $4,541 almost doubled the amount of this cash outlay. The plethora of warning signals surrounding the transaction were sufficient to force the Allens reasonably to investigate the contribution scheme before they went forward. *See Collins v. Commissioner,* 857 F.2d 1383, 1386 (9th Cir.1988) (*Collins* ); *Zmuda,* 731 F.2d at 1422. They did not do so. Thus, the tax court's finding that the Allens were negligent is not clearly erroneous.

■ The Allens further contend that the negligence penalty was wrongly upheld because they justifiably relied on the advice of their financial advisor in entering into the disputed transaction. We have held that although a taxpayer is not necessarily protected by hiring an attorney or accountant, "good faith reliance on professional advice is a defense." *Collins,* 857 F.2d at

1386; *Betson v. Commissioner*, 802 F.2d 365, 372 (9th Cir.1986). We need not determine whether the Allens reasonably relied on their advisor, because the record does not support their claim. All that exists in the record is testimony that Allen relied on the man who regularly prepares his tax returns. Nothing exists regarding either the professional qualification of this return preparer or his purported expertise. There is no finding suggesting the nature of the advice, if any, that was given. Because the Allens bear the burden of proving that the penalty was erroneous, the lack of such findings is fatal to their claim that they justifiably relied on a professional accountant. *See Skeen v. Commissioner*, 864 F.2d 93, 96 (9th Cir.1989); *Hanson*, 696 F.2d at 1234. Thus, the tax court did not clearly err in upholding the negligence penalty.

AFFIRMED.